UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RAMZIDDEN TROWELL, also known as
RAMZIDDIN TROWELL,                                         9:16-CV-00639
                                                          (MAD/TWD)

                                    Plaintiff,            Lead Case

v.                                                        9:16-CV-01203
                                                          (MAD/TWD)

SANTAMORE, W. GARLAND, B. FLEURY,
W. VESNESKE, JOHN DOES 1-5,                               Member Case

                                    Defendants.
_____

APPEARANCES:                              OF COUNSEL:

RAMZIDDEN TROWELL
Plaintiff pro se
2970 W. 24th Street
Apt. 15-E
Brooklyn, New York 11224


HON. ERIC T. SCHNEIDERMAN            WILLIAM A. SCOTT, ESQ.
Attorney General for the State of New York    MELISSA A. LATINO, ESQ.
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT AND RECOMMENDATION

## I.    INTRODUCTION

### A.    Case No. 9:16-CV-00639

On June 6, 2016, *pro se* Plaintiff Ramzidden Trowell commenced the Lead case

("Trowell I") in this consolidated 42 U.S.C. § 1983 civil rights action against Defendants Upstate

Correctional Facility ("Upstate"), Upstate Sergeant ("Sgt.") Santamore, and Upstate Correctional

Officer ("CO") W. Garland.  (Dkt. No. 1.[1])  On initial review by the Hon. Mae A. D'Agostino,

District Court Judge, conducted pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff's original

complaint against Santamore, Garland, and Upstate, liberally construed, was found to allege the

following Eighth Amendment claims arising out of his confinement at Upstate: (1) excessive

force against Santamore, and Does 1-5; (2) deliberate indifference to his serious medical needs

by Upstate staff; (3) conditions of confinement; and (4) failure to protect.  (Dkt. No. 4 at 6.[2])

Plaintiff's claims arose in part out of an incident at Upstate with Santamore and the five Does

alleged to have occurred at Upstate on February 29, 2016, and an incident at Upstate with

Garland alleged to have occurred on March 18, 2016.  *Id*. at 5-9.

     The complaint was dismissed with prejudice against the Upstate medical staff and

without prejudice against Garland.  *Id*. at 19-20.  The sole claim in Plaintiff's original complaint

that survived initial review was his Eighth Amendment excessive force claim against Santamore

and John Does 1-5.  *Id.*

     On December 7, 2016, Judge D'Agostino allowed Plaintiff to file a supplemental

complaint which was ordered incorporated into his original complaint.  (Dkt. Nos. 17-18.)  In his

supplemental complaint, Plaintiff added Upstate Sgt. Vesneske, Manson, Upstate CO Succee,

---

[1]  Unless otherwise identified, docket references are to Trowell I, Case No. 9:16-CV-00639.

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

and Upstate CO Fleury as Defendants, and asserted a harassment claim against Garland.[3]  (Dkt. No. 18 at 11-15.)  Plaintiff also alleged Eighth Amendment claims against Vesneske and Succee for harassing and threatening him.  *Id.* at 12-13.  The incident out of which those claims arose was alleged to have occurred on August 5, 2016.  *Id.*

In her December 7, 2016, Decision and Order addressing, *inter alia*, Plaintiff's motion to dismiss, Judge D'Agostino dismissed the claims asserted in the supplemental complaint against Garland, Vesneske, Succee, and Manson, and allowed the sexual abuse claim against Fleury to proceed.  (Dkt. No. 17 at 17-18.)

On June 9, 2017, Defendants Santamore and Fleury filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust his administrative remedies and is unable to establish an Eighth Amendment violation by the moving Defendants.  (Dkt. No. 27.)  Plaintiff filed opposition papers on July 5, 2017 (Dkt. No. 30), and Defendants filed a reply on July 7, 2017.  (Dkt. No. 31.)

### B.    Case No. 16-CV- 01203

On January 19, 2017, Plaintiff filed the Member case against Defendants Garland and Vesneske.  ("Trowell II").  (Trowell II, Dkt. No. 1.)  Plaintiff added Fleury as a Defendant in his amended complaint (Trowell II, Dkt. No. 11), which was accepted for filing and service and became the operative pleading in the action on March 23, 2017.  (Trowell II, Dkt. No. 18.)  The claims in Plaintiff's amended complaint in Trowell II arose out of the same August 5, 2016,

---

[3]  Plaintiff did not list Fleury as a Defendant in his supplemental complaint but did include allegations of sexual abuse against him which were addressed in Judge D'Agostino's Decision and Order on Plaintiff's motion to dismiss.  (Dkt. No. 17 at 8.)  Judge D'Agostino directed that Fleury be added as a Defendant to the docket.  *Id.* at 17-18.

incident as the claims in Plaintiff's supplemental complaint in Trowell I. (Trowell II, Dkt. No. 11.)

On August 14, 2016, Defendants filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and to abate or stay the proceedings in Trowell II on the grounds that the claims asserted in Plaintiff's supplemental complaint in Trowell I are substantially similar to those asserted in Trowell II. (Trowell II, Dkt. Nos. 29; 29-1 at 5-9.) The Hon. Brenda K. Sannes filed a Memorandum-Decision and Order on November 2, 2017, denying Defendants' motion for a stay and for dismissal on the pleadings and consolidating Trowell II with Trowell I. (Trowell II, Dkt. No. 34 at 2.) In a November 3, 2016, Text Order, Judge Sannes ordered that Trowell I be designated the Lead case and Trowell II the Member case. (Dkt. No. 32; Trowell II, Dkt. No. 35.)

### C.    The Consolidated Action

Following consolidation, this Court issued a Text Order directing the consolidated Defendants to file a supplemental brief in support of the pending motion for summary judgment and granted Plaintiff permission to file a supplemental brief in response. (Dkt. No. 33.) The Court subsequently granted defense counsel's request to file supplemental declarations with the supplemental brief. (Dkt. Nos. 35, 36.) Defendants filed their supplemental papers on November 30, 2017. (Dkt. No. 37.) Plaintiff has filed no response.

For reasons explained below, the Court recommends that Defendants' motion for summary judgment in the consolidated action be granted. The Court further recommends that the consolidated action be *sua sponte* dismissed as against the unidentified John Does 1-5 pursuant

to 28 U.S.C. § 1915(e).

## II.    FACTUAL BACKGROUND

### A.    Santamore and John Does 1-5

Plaintiff was transferred from Downstate Correctional Facility to Upstate on February 29, 2016. (Dkt. No. 1 at 5.) During intake, Plaintiff was taken to the I.D. room for pictures and told once he was returned to the block he would see medical. (Dkt. No. 27-3 at 81.) When he was placed in a holding cell, Plaintiff asked to see a nurse because he had not had his medication for two days. *Id.;* Dkt. No. 18 at 5. According to Plaintiff, he was told he had already seen medical, when he had not, and he began to yell, demanding to see a sergeant. (Dkt. No. 18 at 6.) An unidentified sergeant and five COs approached the holding pen and threatened Plaintiff and told him "if he [did not] shut the fuck up and sign [his] name on some paper that [he] refused to sign that [he] would receive more than medical attention." *Id.* Plaintiff signed the paper but kept asking to see medical. *Id.* Having been placed on notice he was being threatened and ignored by a sergeant and 5 COs, Plaintiff began to look for support from other inmates by yelling and demanding to see medical. *Id.*

The sergeant and five COs ultimately took Plaintiff to the infirmary. *Id;* Dkt. No. 27-3 at 99. Plaintiff claims Santamore was in charge once Plaintiff was in the infirmary and joined with the unidentified sergeant and COs who had brought him there in telling Plaintiff to strip and in hitting and kicking him when he refused to give up his undershorts. (Dkt. No. 27-3 at 103-08.) Plaintiff contends the hitting and kicking continued until he complied and gave them his undershorts. *Id.* at 112. Plaintiff testified at his deposition that he could not see who was hitting

and kicking him because he was facing the wall. (Dkt. No. 27-3 at 107, 110.) Plaintiff also testified he saw Santamore at the door when they first put him in the room but was not sure whether Santamore came in. *Id.* Plaintiff claims he was then left in the room with no clothing. (Dkt. No. 18 at 7.)

Plaintiff contends he was taken to the infirmary at around 5:00pm on February 29, 2016, and was left there without any clothes other than a little gown, hurt, cold, and humiliated until around 1:00pm on March 1, 2016. (Dkt. Nos. 18 at 7; 27-3 at 101, 116.) According to Plaintiff, Santamore was also at the infirmary the morning of March 1st. (Dkt. No. 27-3 at 109.) Plaintiff was told he was going to go see a "psych" and was cuffed and made to sit in the corner of the room with only a little gown while he spoke with a gentleman named Kemp from the Office of Mental Health ("OMH"). *Id.* at 109, 117. Kemp told Plaintiff he would see medical after Kemp was done seeing him. *Id.* at 118. Plaintiff testified that after Kemp left, Santamore told him to come to the door to be uncuffed, and he would see medical when Santamore was done with him. *Id.* at 118-20. After Plaintiff was uncuffed, he was told he was going back to the block. *Id.* at 121. When Plaintiff arrived at the block, he was forced into a cell with a cellmate with gang affiliation who sexually assaulted him. *Id.* at 121-22; Dkt. No. 18 at 8.

In his declaration in support of Defendants' motion, Santamore denies participating in Plaintiff's transport, being present when Plaintiff was placed in the infirmary on February 29, 2016, and using any force on Plaintiff. (Dkt. No. 27-6 at ¶¶ 4, 12.[4]) According to Santamore, he did have interaction with Plaintiff on March 1, 2016, when he was asked to respond when

---

[4] Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

Plaintiff, after being handcuffed for a mental health consult, refused to allow officers to remove the cuffs.  *Id.* at ¶ 7.  Santamore states in his declaration that Plaintiff ultimately complied and no force was used.  *Id.* at ¶ 8.

      **B.**      **Garland, Vesneske, and Fleury**

      On the morning of August 5, 2016, CO Garland was with RN Elizabeth White when she came to give Plaintiff his medication.  (Dkt. Nos. 18 at 12; 27-3 at 143; 37-3.)  Plaintiff claims Garland told him to state his name and I.D. number.  (Dkt. No. 27-3 at 143.)  Plaintiff provided the information to the nurse and reached out his hand to get his medication.  *Id.*  According to Plaintiff, Garland blocked the nurse and told Plaintiff to state his I.D. number again.  *Id.*  Plaintiff asked the nurse if she had heard him and she shook her head.  *Id.*  Plaintiff then asked for his daily medication.  *Id.*  Plaintiff claims that Garland then tried to close the slot through which Plaintiff had reached for his medication on his arm, resulting in a row of cuts on Plaintiff's arm. *Id.*

      Plaintiff began asking for a sergeant and Vesneske came to see him.  *Id.* at 144.  Plaintiff claims he told Vesneske he had been assaulted and did not receive his medication, and Vesneske put his hand on Garland's shoulder and walked away with him.  *Id.*  Vesneske came back and asked Plaintiff if he wanted to see mental health, and Plaintiff responded he did not want to see mental health but did want to see medical for his arm.  *Id.*  at 144-45.  When Vesneske told Plaintiff he was going to cuff up and go to mental health, Plaintiff refused and asked him to call the Deputy and a lieutenant.  *Id.*  The Deputy of Programs, a lieutenant, and a captain came one at a time, and Plaintiff tried to explain what Garland had done to him and that he did not need

mental health and was not going to go there and be stripped of his clothes and left to freeze.  *Id*. at 145, 158-59, 197.  Lieutenant Eddy told Plaintiff if he did not cuff up an extraction team would be sent in.  *Id*. at 157-58.  When Captain Dominique came and told Plaintiff the same thing, Plaintiff began breaking down.  *Id*. at 159.  Plaintiff claims to have handed the Deputy some paperwork and expected her to put her foot down and tell them to take Plaintiff to medical, but that did not happen.  *Id*.  Garland, who had returned to Plaintiff's cell, told him he was going to be extracted from his cell and beaten.  *Id*. at 170-71.  Vesneske came and told Plaintiff the same thing.  *Id*. at 171.

According to Plaintiff, he was gassed with a spray in his cell, beaten by an extraction team consisting three men wearing masks and suits, and rendered briefly unconscious by a kick to the side of the head.  *Id.* at 145, 173-84.  When Plaintiff awoke, he was handcuffed and shackled and put in a shower area where they washed off the chemicals.  *Id.*  at 183.  The extraction team then dragged Plaintiff to the holding pen holding him up by his arms.  *Id*. at 146, 155.  The team thereafter dragged Plaintiff to the infirmary where he was again beaten.  *Id*.  Plaintiff testified at his deposition that Vesneske and CO Fleury were involved, and that Fleury placed his finger in Plaintiff's rectum.  *Id*.  The Use of Force Report regarding the August 5, 2016, incident submitted by Plaintiff notes that Fleury "using both hands, spread Trowell's buttocks to visually inspect the area" during the strip frisk that was conducted in the infirmary.  (Dkt. No. 30-1 at 20-21.)

In his declaration submitted in support of Defendants' motion, Garland states that on August 5, 2016, while he was assisting the nurse with medications, Plaintiff refused to state his

name and DIN number when asked by the nurse. (Dkt. No. 37-1 at ¶¶10-12.) Garland then directed Plaintiff to state his number and Trowell refused saying he did not have to give his number. *Id*. at ¶¶ 14-15. According to Garland, Plaintiff's refusal to give his I.D. number was considered a refusal of his medication, so the visit was ended and Plaintiff's medication was not provided to him. *Id*. at ¶ 16. Garland denies ever closing the protective hatch cover on Plaintiff's arm or hand. *Id*. at ¶ 17. Garland contends that if Plaintiff had tried to stick his arm out of the slot and grab his medication after the nursing visit had been terminated, Garland would have called the area supervisor to report Plaintiff's noncompliance with staff direction and would never have slammed the hatch cover on his hand. *Id*. at ¶¶ 20-21. Garland at no time saw an injury to Plaintiff's hand or arm. *Id*. at ¶ 22.

Garland further states in his declaration that later that morning he gave Plaintiff a direct order to secure his exercise pen by closing the door because exercise time had ended. *Id*. at ¶ 24. Plaintiff refused and covered his cell door window with a towel. *Id*. at ¶ 25. Garland issued an Inmate Misbehavior Report ("IMR") charging Plaintiff with interference with movement and failing to obey a direct order. *Id*. at ¶ 26 and p. 11.

Nurse White has submitted a declaration in which she states that she did not observe Garland close the hatch cover on Plaintiff's arm or hand or injure Plaintiff in any way during med runs on August 5, 2016. (Dkt. No. 37-3 at 3, 14, 15.) White examined Plaintiff after he was extracted from his cell and found a superficial laceration on his right hand and a minor abrasion in this left shoulder area. *Id*. at ¶ 20.

In his declaration, Vesneske states that he was called to Plaintiff's cell on August 5, 2016,

when Plaintiff refused to remove the towel from the window of his cell door, in violation of DOCCS rules of conduct.  (Dkt. No. 37-2 at ¶¶ 7-8.)  Vesneske does not recall his exact conversation with Plaintiff, but in a memo prepared on February 21, 2017, in response to a grievance filed by Plaintiff, Vesneske indicated he did not recall Plaintiff bringing any issue regarding a cut on his hand to his attention.  *Id.* at ¶ 9.

According to Vesneske, at some point following Plaintiff's refusal to remove the towel, OMH staff member J. Marinelli went to speak with Plaintiff and advised Vesneske he was authorizing Plaintiff to be put on OMH watch for claims of self-harm.  *Id.* at ¶ 10.  Vesneske explained that once an OMH staff member authorizes an inmate to be placed on OMH watch, he must be taken from his cell for observation, and if he does not comply, extraction protocols must be executed.  *Id*. at ¶ 11.  Despite several direct orders by staff, Plaintiff refused to exit his cell voluntarily.  *Id*. at ¶ 13.

Extraction using chemical agents, which are used to help gain an inmate's compliance, was authorized by the Acting Superintendent, and medical notified Vesneske that Plaintiff was medically cleared for use of the chemicals.  *Id*. at ¶¶ 14-17.  Vesneske, who has been involved in multiple cell extractions, saw nothing out of the ordinary and did not see any use of excessive force on Plaintiff.  *Id*. at ¶¶ 24, 31.  A nurse examined Plaintiff and did not note any serious injuries, and Plaintiff refused medical attention.  *Id*. at ¶ 34.  According to Vesneske, while he and other officers were taking Plaintiff to OMH, Plaintiff was banging his head on the walls and bars.  *Id*. at ¶ 35.

Fleury also filed a declaration in support of Defendants' motion.  (Dkt. No. 27-8.)

10

According to Fleury, he did participate in the cell extraction on August 5, 2016, and at no time did he insert a finger in Plaintiff's rectum, call him a bitch, or use any more force than was necessary to remove him from his cell and ensure safe transport to the infirmary. *Id*. at ¶¶ 4, 12-13.

### C.   Plaintiff's Grievances

  1.   <u>Defendants' Evidence on Failure to Exhaust</u>

Defendants assert that Plaintiff failed to exhaust his administrative remedies with regard to the February 29, 2016, and August 5, 2016, incidents about which he complains.[5]  In her declaration in support of Defendants' motion, Donna Wilcox, Inmate Grievance Program ("IGP") Supervisor at Upstate, stated that at the time Plaintiff was housed at Upstate the facility had a fully functional inmate grievance process.  (Dkt. No. 27-10 at ¶¶ 1,8.)  Wilcox is responsible for keeping records of grievances filed by inmates at the facility level at Upstate. *Id*. at ¶ 9.  At the request of defense counsel, Wilcox searched the IGP records to determine if Plaintiff had filed any grievances relating to the February 29, 2016, and August 5, 2016, incidents. *Id*. at ¶ 10.  Wilcox discovered Plaintiff had filed only two grievances while at Upstate in 2016, one of which involved the August 5, 2016, incident, and neither of which involved the February 29, 2016, incident. *Id*. at ¶¶ 11, 14.

Grievance UST-59509-16, filed on October 28, 2016, entitled "Strip Frisk/Assault,"

---

  [5]  Although Plaintiff claims he also saw Santamore on March 1, 2016, he has not alleged misconduct by Santamore on that date, and IGP Supervisor Wilcox has confirmed no grievance was filed regarding March 1, 2016.  (Dkt. No. 27-10 at ¶ 11.)

complained about alleged physical and sexual assaults during the August 5, 2016, incident.[6] (Dkt. No. 27-12 at 1-3.)  The grievance described Plaintiff's claims that: (1) Garland attempted to close the slot on his left arm; (2) he was gassed and assaulted in his cell; (3) he was dragged to the infirmary in his shorts and assaulted again; (4) he was left in a room in pain without any medical attention for ten days; and (5) one of the unknown masked officers, later identified by Plaintiff as Fleury, stuck his finger in Plaintiff's rectum.  *Id*.

On March 9, 2016, the Upstate Superintendent rendered a determination noting that Plaintiff had complained of both physical and sexual assaults and stating that Plaintiff's sexual assault claim, made under the Prison Rape Elimination Act (PREA), was being separately investigated.  (Dkt. No. 27-12 at 13.)  The Superintendent concluded that "[u]pon review of the information submitted, no misconduct by staff was found and no further action will be taken at this time.  Grievance is denied."  *Id*.  According to Karen Bellamy, Director of the DOCCS IGP and custodian of the records maintained by the Central Office Review Committee ("CORC"), the only grievance appealed to CORC by Plaintiff while he was at Upstate was unrelated Grievance UST-59857-16.  (Dkt. No. 27-13 at ¶¶ 1-2, 12-15.)

2.    Plaintiff's Evidence Regarding Exhaustion

At his deposition, Plaintiff testified he filed a grievance with regard to the February 29, 2016, incident involving Santamore but never received a response.  (Dkt. No. 27-3 at 123, 128.) Plaintiff initially testified that he wrote the grievance around April 2016, and handed it to a female Deputy, and that it was the first time he attempted to file a grievance involving the issue

---

[6]  The other grievance, Grievance UST-59857-16, involved an unrelated incident that occurred on November 19, 2016.  (Dkt. No. 27-10 at ¶¶ 13-14.)

in the infirmary with Santamore. *Id*. at 134-35. He subsequently testified it may have been even later because he did not attempt to file the grievance until he was moved to level three, which occurred some where around May or June of 2016. *Id*. at 137-38.

In opposition to Defendants' motion, Plaintiff has submitted a copy of a grievance, dated December 5, 2016, which references the February 29, 2016, incident with Santamore and states that he had previously filed a grievance regarding the incident and never received a response. (Dkt. No. 30-1 at 2-6.) In a memorandum from Wilcox to Plaintiff, dated December 7, 2016, submitted by Plaintiff, Wilcox informed Plaintiff that a grievance had to be submitted within twenty-one calendar days after the occurrence; an IGP Supervisor could grant an exception to the time limit within forty-five days after the alleged occurrence; and an inmate could pursue a complaint that an exception was denied by filing a separate grievance. *Id*. at 1.

As to Grievance UST-59509-16, Plaintiff does not dispute his failure to appeal to CORC but claims the Superintendent's decision advised him he had exhausted his administrative remedies. (Dkt. No. 27-3 at 203.) The Superintendent's determination does not, in fact, state that Plaintiff's administrative remedies have been exhausted. (Dkt. No. 27-12 at 13.) The sole reference to exhaustion found in the record is an October 28, 2016, memorandum from IGP Supervisor Debyah to Plaintiff informing him that "[y]our PREA allegations will be deemed exhausted upon filing for Prison Litigation Reform Act (PLRA) purposes." *Id*. at 4.

## III.   APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[7]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

---

[7]  Plaintiff's original and supplemental complaints in Trowell I (Dkt. No. 18) and his amended complaint in Trowell II (Trowell II, Dkt. No. 11) are properly verified under 28 U.S.C. § 1746.  (Dkt. No. 72 at 12-13.)  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."   "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id*. (citation and internal quotation marks omitted).   "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations.  "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)  (citation omitted).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[8] (citing *Carey v. Crescenzi*, 923

---

[8] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

F.2d 18, 21 (2d Cir. 1991)).

## IV.   PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status

"does not relieve [a pro se] plaintiff of his duty to meet the requirements necessary to defeat a

motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

In this case, Plaintiff has failed to respond to Defendants' statement of material facts as required

under N.D.N.Y.  L.R. 7.1(a)(3).[9]  (*See* Dkt. Nos. 30 and 30-1.)

Where a party has failed to respond to the movant's statement of material facts, the facts

in the movant's statement will be accepted as true (1) to the extent they are supported by

evidence in the record,[10] and (2) the nonmovant, if proceeding *pro se*, has been specifically

advised of the possible consequences of failing to comply with the requirements of Rule 56(e) of

the Federal Rules of Civil Procedure and L.R. 7.1.[11]  *See Champion,v. Artuz*, 76 F.3d 483, 486

(2d Cir. 1996).

---

[9]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[10]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[11]  Defendants included the requisite notification of the consequences of failing to respond to a summary judgment motion in accordance with their notice of motion.  (Dkt. No. 27 at 4.)

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).  In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record in this case.

## V.    LEGAL STANDARD FOR THE EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants seek summary judgment on Plaintiff's excessive force claims on the ground that he failed to exhaust his administrative remedies under the DOCCS IGP.  Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, __ U.S. ___, 136 S. Ct. 1850, 1854-55 (2016).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id*. § 701.5(a)(1). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. § 701.5(c)(3)(I).

18

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.5(d)(3)(ii).

Special procedures are used when, as in this case, the grievance involves a claim of staff misconduct. *Id*. § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id*. § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id*. § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can    and must    be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps

that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end   with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v.*

*City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements.  *See Jones,* 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95.  Plaintiff must then establish that the IGP grievance procedure was unavailable to him.  *See Jones*, 549 U.S. at 216.

## VI.    ANALYSIS

### A.    Administrative Exhaustion as to Santamore and John Does 1-5

The Court finds Defendants have satisfied their burden of showing that Plaintiff failed to satisfy the IGP exhaustion requirements with regard to the incident alleged to have taken place with Santamore and the five John Does on February 29, 2016.  A search of IGP records at Upstate by Wilcox uncovered no grievance by Plaintiff with regard to the incident.  (Dkt. No. 27-10 at ¶¶ 10-11, 14.)   According to Bellamy, the single grievance appealed to CORC by Plaintiff, Grievance UST-59857-16, involved an unrelated matter.  (Dkt. No. 27-12 at ¶¶ 1-2, 12-15.) Thus, Defendants have shown that Plaintiff failed to complete all of the required steps under the IGP with regard to the February 29, 2016, incident.  *See Woodford,* 548 U.S. at 88 (complete exhaustion requires properly using all steps required by the administrative review process applicable to the institution in which an inmate is confined).

Moreover, the Court finds that Plaintiff has failed to show that the grievance procedure was unavailable to him as is his burden under *Ross,* 136 S. Ct. at 1859.  Plaintiff claims he filed a grievance regarding the Santamore incident but never received a response.  (Dkt. Nos. 27-3 at 123, 128; 30-1 at 2.)  However, at his deposition, Plaintiff testified that he filed the grievance (no

21

copy of which has been produced as evidence by Plaintiff) at the very earliest in April 2016 and possibly in May or June, rendering it untimely under the IGP, which requires filing within twenty-one days of the incident being grieved.  (Dkt. No. 27-3 at 134-35, 137-38.)  *See* 7 N.Y.C.R.R. § 701.5(a)(1).  Plaintiff has offered no evidence that the grievance procedure was "unavailable" between the time of the February 29, 2016, incident and the claimed filing of an untimely grievance in April, May, or June of 2016.  Plaintiff's December 5, 2016, grievance regarding the February 29, 2016, incident with Santamore was clearly untimely and was rejected.  (Dkt. No. 30-1 at 1.)

Based upon the foregoing, the Court finds that Plaintiff failed to file a timely grievance regarding the Santamore incident despite the availability of the IGP and recommends that Santamore be granted summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies.

The Court also recommends that the consolidated action be *sua sponte* dismissed with prejudice as against John Does 1-5, who are alleged to have been involved in the February 29, 2016, excessive force incident. (Dkt. No. 27-3 at 103-08.)  28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim upon which relief can be granted."  28 U.S.C. § 1915(e)(2)(B)(ii).  *See also Webster v. Penzetta*, 458 F. App'x. 23, 25 (2d Cir. 2012) ("A district court has inherent authority to dismiss meritless claims *sua sponte*."); *Ramrattan v. Fischer,* No. 13 Civ. 6890 (KPF), 2015 WL 3604242, at *3 (S.D.N.Y. June 9, 2015) ("[E]ven where Defendants have not sought dismissal of a particular claim, the Court has the authority to screen sua sponte an *in forma pauperis* complaint and must dismiss a complaint, or portion

thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.") (citing 28 U.S.C. § 1915(e)(2)(B) and *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)).

Plaintiff's allegations supporting his Eighth Amendment excessive force claims against John Does 1-5 are essentially the same as those asserted against Santamore.  (*See* Dkt. No. 1 at ¶¶ 2, 4-7, 9-12, 14, 19.)  There is no evidence whatsoever that Plaintiff administratively exhausted his claims against John Doe 1-5.  Therefore, the Court recommends that the case be *sua sponte* dismissed with prejudice against John Does 1-5 for failure to exhaust under 28 U.S.C. § 1915(e)(2)(B).

### B.    Administrative Exhaustion as to Garland, Vesneske, and Fleury

Defendants concede that Plaintiff filed Grievance UST-59509-16 with regard to the August 5, 2016, incident involving Garland, Vesneske, and Fleury.  (Dkt. No. 27-12 at 1-3.)  However, they have submitted evidence showing that Plaintiff did not file an appeal with CORC from the Superintendent's denial of the grievance on March 9, 2017, thereby satisfying their burden of showing Plaintiff's failure to exhaust under the IGP.  (Dkt. Nos. 27-12 at 13; 27-13 at ¶¶ 1-2, 12-15; 27-16 at 11.)

As noted above, Plaintiff claims he was not required to appeal the denial of Grievance UST-59509-16 to CORC because in his denial, the Superintendent informed Plaintiff his grievance had been exhausted.  (Dkt. No. 27-3 at 203.)  However, as discussed above, the Superintendent's determination said no such thing.  The determination said only that the PREA sexual assault claim was being separately investigated and the remainder of Plaintiff's grievance was denied.  (Dkt. No. 27-12 at 4, 13.)

23

Based upon the foregoing, the Court finds that Garland, Vesneske, and Fleury have met their burden of showing Plaintiff failed to exhaust his Eighth Amendment excessive force claim against them in that by admittedly not appealing to CORC from the Superintendent's denial of his grievance as to the excessive force claims, Plaintiff failed to properly complete all of the steps required by the IGP. *See Woodford,* 548 U.S. at 88. The Court further finds that Plaintiff has failed to show that exhaustion was unavailable and recommends that Defendants Garland and Vesneske be granted summary judgment on failure to exhaust grounds.

The Court, however, recommends that Fleury be granted summary judgment on failure to exhaust grounds solely with respect to Plaintiff's Eighth Amendment excessive force claim. The Court recommends Fleury be denied summary judgment on failure to exhaust grounds with respect to Plaintiff's Eighth Amendment sexual abuse claim in that documents submitted by Defendants indicate the sexual abuse claim against Fleury (his PREA allegation) was deemed exhausted for PLRA purposes upon Plaintiff's filing of Grievance UST-59509-16 under the IGP. (*See* Dkt. No. 27-12 at 4.)

**C.    Fleury's Entitlement to Summary Judgment on the Merits on Plaintiff's Eighth Amendment Sexual Abuse Claim**

1.    Record Evidence Regarding the Alleged Sexual Abuse

In his supplemental complaint, Plaintiff alleges that after he had been dragged to the infirmary on August 5, 2016, "Fleury put a gloved finger in [his rectum] and called [him] a bitch." (Dkt. No. 18 at 13.) In his October 26, 2016, grievance, Plaintiff wrote "once down in the infirmary out of eye sight I was assaulted again I was held down on a bed while one of the unknown masked officers stuck a finger in my anus." (Dkt. No. 27-12 at 3.)

24

At his deposition, Plaintiff testified Fleury "put his finger in my ass, talking about I had a weapon."  (Dkt. No. 27-3 at 146.)  According to Plaintiff, Vesneske was present and was holding the camera when the alleged incident with Fleury occurred.  *Id*. at 195.  Plaintiff testified that when Fleury put his finger in Plaintiff's rectum, Plaintiff reached up and grabbed the front of Fleury's helmet to see his face and was given an IMR for assaulting Fleury.  *Id*. at 186, 188, 190. Plaintiff acknowledged at his deposition that Defendants had video camera footage of the incident.  *Id*. at 186, 195.

Fleury submitted a declaration in support of Defendants' motion in which he referred to a video submitted by Defendants which shows that an involuntary strip frisk was ordered and conducted pursuant to DOCCS directives while Plaintiff was in the infirmary.  (Dkt. No. 27-8 at ¶12.)  Fleury denies inserting his finger in Plaintiff's rectum and also denies calling Plaintiff a "bitch" and states the video shows that neither he nor any other officer inserted a finger into Plaintiff's rectum.  *Id*. at ¶¶ 10, 12.  As noted above, the Use of Force Report regarding the August 5, 2016, states that Fleury "using both hands, spread Trowell's buttocks to visually inspect the area" during the strip frisk.  (Dkt. No. 30-1 at 20-21.)

Fleury also submitted a statement in connection with the PREA investigation in which he denied sticking his finger in Plaintiff's rectum.  (Dkt. No. 27-12 at 11.)  Vesneske submitted a signed statement, date February 2, 2017, as a part of the investigation in which he stated he "did not observe any staff stick their finger in Trowell's butt."  *Id*. at 10.  Lt. Salls submitted a signed statement indicating Plaintiff had refused to comply with the strip frisk procedures in the infirmary and that force was authorized and used to complete the frisk.  *Id*. at 9.  According to Salls, "at no time did [he] observe any staff sexually assault inmate Trowell by placing a finger

or any object in his anus." *Id.* Salls stated that the entire incident was documented in UI-16-0082 and UI-16-0073.[12] *Id.* M. Kelsh, Acting DDS, who conducted the PREA investigation, reported to Superintendent Uhler on March 6, 2017, that he had reviewed the video for the PREA complaint and found no evidence supporting Plaintiff's complaint; staff were interviewed and provided written statements denying the allegations; and had interviewed Plaintiff. *Id.* at 7. Kelsh found no merit to Plaintiff's PREA complaint. *Id.*

2.    Legal Analysis

In *Boddie v. Schneider*, 105 F.3d 857, 859 (2d Cir. 1997), the Second Circuit held that sexual abuse by a corrections officer can give rise to an Eighth Amendment claim. However, it is not enough that a corrections officer engaged in direct contact with an intimate area of an inmate's body. In *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015), the Court explained, that "[i]n determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (explaining that the Eighth Amendment analysis turns on "whether force was applied in a good faith effort to maintain or restore order or discipline or maliciously and sadistically for the very purpose of causing harm" (internal quotation marks omitted)).

Plaintiff claims Fleury inserted his finger in Plaintiff's rectum while he was being held

---

[12] Videos UI-16-0082 and UF-16-0073, which show Plaintiff's extraction from his cell, the shower stop, travel through the hallway to the infirmary, and the frisk search that took place in the infirmary have been submitted as evidence in support of Defendants' motion and have been viewed by the Court. (Dkt. No. 27-4.) The Court did not observe anything in the video supporting Plaintiff's sexual assault claim.

down on a bed in the infirmary and acknowledges the incident was captured by video camera. (Dkt. No. 27-12 at 3.)  Fleury denies doing so, and his denial is supported by Vesneske and Salls, both of whom were present in the infirmary at the time of the alleged incident.  (Dkt. Nos. 27-8 at ¶¶ 10, 12; 27-12 at 9-10.)

Significantly, even if Fleury did as Plaintiff claims, the summary judgment record supports a determination that Fleury was engaged in legitimate official duties at the time, and there is nothing in the record suggesting Fleury did it to arouse or gratify himself or humiliate Plaintiff, crucial elements of an Eighth Amendment sexual abuse claim.  *See Crawford*, 796 F.3d at 257.  To the contrary, the evidence reveals that Fleury and other corrections personnel were in the process of attempting to perform a strip search on Plaintiff when he was placed on the bed in the infirmary, that Plaintiff failed to comply with the strip search and force was authorized, and that as part of the strip search, Fleury "spread Trowell's buttocks to visually inspect the area." (Dkt. Nos. 27-8 at ¶ 12; 27-12 at 9; 30-1 at 20-21.)  The videotape of the strip search, submitted as evidence by Defendants, supports their contention that Plaintiff was resisting being strip searched at the time Fleury allegedly put his finger in Plaintiff's rectum, and that an element of force was used to complete the search.[13]  (Dkt. No. 27-4.)[14]

Generally, "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."  *United States v. REM*, 38 F.3d 634, 643 (2d Cir. 1994).  However, "[w]hen opposing parties tell two different

---

[13]  There has been no claim that the videotape was doctored or altered in any way.  *See Scott,* 550 U.S. at  378.

[14]  The videotapes were provided to the Court for viewing via conventional filing.

stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment."[15]  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court finds

that even if a rational jury could conclude that Fleury put his finger in Plaintiff's rectum during

the strip search, which seems highly unlikely given the video, a rationale jury could not find that

Fleury was engaged in conduct that served no penological purpose at the time, or that Fleury

intended under the circumstances revealed by the video and other evidence to gratify his sexual

desire or humiliate Plaintiff.

Concluding that no rational jury could find in Plaintiff's favor on his Eighth Amendment

sexual abuse claim, the Court recommends that Fleury be granted summary judgment on the

merits.

**WHEREFORE**, it is hereby

**RECOMMENDED** that consolidated Defendants' motion for summary judgment in the

consolidated action (Dkt. No.  27) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that the consolidated action be *sua sponte* **DISMISSED WITH**

**PREJUDICE** against John Does 1-5 pursuant to 28 U.S.C. § 1915(e); and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance with

the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

---

[15]  In *Scott,* 550 U.S. at  380, the Supreme Court made clear that video evidence
submitted in connection with a summary judgment motion should absolutely be considered in
determining whether material issues of fact exist.

written objections to the foregoing report.[16]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated: February 9, 2018
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[16]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED    that    the    attached    report    and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

1999 WL 983876

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terrell K. ELEBY, Plaintiff,
v.
G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS:ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

**\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

I. BACKGROUND [1]

Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone to
cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and
telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at
73-72.

II. PROCEDURAL HISTORY

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action.[2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Exhaustion of Administrative Remedies

**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

1. Legal Principles Governing
Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136

2017 WL 986123

S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, —— Fed.Appx. ——, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(3)(i), (ii).

**\*4** The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/ or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can— and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to

exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

2. <u>Analysis</u>

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited

process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

## All Citations

Slip Copy, 2017 WL 986123

Footnotes

1  In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2  Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

3  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

4  The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

5  Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

6  According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

7  Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

8  In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

9  In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

10  If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan Mena, Plaintiff,
v.
City of New York, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1**  Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-

hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2**  As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a

number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court

to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record when one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

### III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's

effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days [,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly

rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ___, ___, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3948100

Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

End of Document    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3604242
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jerry RAMRATTAN, Plaintiff,
v.
Brian FISCHER, et al., Defendants.

No. 13 Civ. 6890(KPF).
|
Signed June 9, 2015.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge.

**\*1** Plaintiff Jerry Ramrattan, a New York State prisoner proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc ("RLUIPA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 to 12213 (the "ADA"). Plaintiff alleges that the failure of the New York State Department of Corrections and Community Supervision ("DOCCS") to hire a Hindu chaplain and provide meals compliant with his religious beliefs violates his rights under the Free Exercise Clause of the First Amendment and RLUIPA. Plaintiff also brings an ADA claim in connection with his claimed need for hearing aids. Defendants have moved to dismiss the Complaint for failure to state a claim. For the reasons discussed herein, that motion is granted.

**BACKGROUND** [1]

**A. Factual Background**
Plaintiff practices the Hindu religion. (Compl.5). Upon arriving in DOCCS custody, Plaintiff identified himself as a member of the Hindu faith, and attempted to seek out a Hindu chaplain who could assist him in the practice of his religion. (*Id.*). Plaintiff was informed that DOCCS did not employ a Hindu chaplain. (*Id.*). Plaintiff then began filing grievances and writing letters to various officials within and outside of DOCCS, complaining about the lack of a Hindu chaplain and advocating for the hiring of one. (*Id.*). In response to his numerous inquiries, Plaintiff was

informed that it was not fiscally possible for DOCCS to employ a chaplain for every religious group, especially where the population of inmates practicing a particular religion was very small. (*See, e.g.,* Dkt. # 2–2 at 18). In the case of Hinduism, he was told, far less than one percent of the prison population had identified as Hindu (*viz.,* fewer than 50 inmates out of a population of over 55,000). (*See id.*). Plaintiff was repeatedly advised to follow the procedure set forth in DOCCS Directive # 4202 on Religious Programs and Practices and was encouraged to work with the coordinating chaplain at his facility to locate a religious volunteer to assist him in the practice of his religion. (*See id.; see also* Dkt. # 2–2 at 31, 32, 35, 36, 38; Dkt. # 2–3 at 3, 4; Dkt. # 2–6 at 31).

Plaintiff did write the coordinating chaplain at Auburn Correctional Facility, who informed Plaintiff that he would help provide materials and support. (Compl.37). He further explained that although DOCCS could not accommodate a "group meet" or other group-oriented religious services for "just one person," Plaintiff "MOST CERTAINLY" [*sic*] would be "allowed to worship in the privacy of [his] cell as needed." (*Id.*). The coordinating chaplain at Great Meadow Correctional Facility [2] later provided Plaintiff with a similar response. (*See* Dkt. # 2–6 at 31). Despite these communications, Plaintiff alleges that DOCCS's failure to hire a Hindu chaplain has interfered with his ability to practice his religion and constitutes unlawful religious discrimination. (Compl.5–6). Plaintiff further complains that he has been forced to eat foods that do not comport with his religious dietary restrictions, and that he has been unable to observe unspecified "religious holy days and rites." (*Id.* at 5).

**\*2** In addition to his claims based on religion, Plaintiff also alleges that, in response to his numerous grievances, he has been subjected to retaliation by Defendants. (Compl.8–9). Finally, in a single sentence near the end of his narrative, Plaintiff alleges that Defendants have violated his rights under the ADA. (*Id.* at 9).

**B. Procedural Background**
On September 27, 2013, Plaintiff initiated this lawsuit against Defendants, seeking $25 million in damages, including "punitive rewards for deliberate indifference, pain (spiritual and emotional), religious suffering, religious discrimination, physical suffering, discriminatory hiring practices, violations of my

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1

constitutional rights ... and direct harm from foods ingested." (Compl.11). Plaintiff also sought injunctive relief in that DOCCS be required to hire a Hindu chaplain and that DOCCS "provide for [his] religious needs in all aspect[s]." (*Id.*).

On October 31, 2013, this Court issued an order of service. In addition to directing Plaintiff to complete the paperwork that would permit the United States Marshals Service to effect service on his behalf, the Order also dismissed DOCCS from the case as an entity that could not be sued under Section 1983 due to Eleventh Amendment immunity. (Dkt.# 6).[3] Between November 2013 and March 2014, Plaintiff sent the Court numerous letters setting out Plaintiff's allegations concerning retaliation against him for filing the instant lawsuit, and seeking a protective order. (*See* Dkt. # 7, 9–12, 14, 18–21). The Court denied Plaintiff's requests contained within those letters and provided guidance as to how to proceed with new complaints. (Dkt.# 20). Nonetheless, Plaintiff continued to submit numerous letters to the Court concerning matters outside the scope of his claims in this lawsuit. (*See, e.g.,* Dkt. # 22–24, 34, 41).

On June 27, 2014, Defendants submitted a pre-motion letter describing their proposed motion to dismiss and requesting a conference. (Dkt.# 43). On July 24, 2014, Plaintiff submitted a response to Defendants' pre-motion letter that addressed the substance of Defendants' proposed motion. (Dkt.# 46). The Court held a telephonic pre-motion conference with all parties on July 29, 2014. (*See* Dkt. # 52 ("July 29, 2014 Tr.")). Among other things, at that conference, the Court ensured that Plaintiff understood that he would have another opportunity to respond more fully to Defendants' motion once they filed it. (*Id.* at 4–5). As it happened, Plaintiff did not submit an opposition to Defendants' motion to dismiss; accordingly, given Plaintiff's *pro se* status, the Court accepts Plaintiff's opposition to Defendants' pre-motion letter as his opposition to their motion.

In their motion papers, Defendants argue that the Complaint should be dismissed because: (i) Plaintiff cannot maintain an ADA claim against individuals; (ii) damages against Defendants in their official capacities are barred by the Eleventh Amendment; (iii) money damages are not available to Plaintiff under RLUIPA; (iv) Plaintiff fails adequately to allege the individual Defendants'

personal involvement in any alleged constitutional violation; (v) Plaintiff fails to state a cognizable constitutional violation to sustain a Section 1983 claim; and (vi) Plaintiff fails to state a cognizable claim for retaliation. (Def.Br.1–2, 4–12). In his opposition, Plaintiff argues that he has stated claims, and provides incremental factual information, as discussed further below. (*See generally* Pl. Opp.).

### DISCUSSION

**A. Motions to Dismiss Under Fed.R.Civ.P. 12(b)(6)**
 **\*3** Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering such a motion, a court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009)).

A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [a plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)). The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman,* 517 F .3d 140, 149 (2d Cir.2008) (citation and internal quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir.2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Int'l*

*Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam)).

"[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended." *Hill v. City of New York,* No. 13 Civ. 8901(KPF), 2015 WL 246359, at *2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks omitted). Further, even where Defendants have not sought dismissal of a particular claim, the Court has the authority to screen *sua sponte* an *in forma pauperis* complaint at any time and must dismiss a complaint, or portion thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

**B. Plaintiff's ADA Claims Are Dismissed**

**1. Applicable Law**
**\*4** The purpose of the ADA is to "eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied." *Andino v. Fischer,* 698 F.Supp.2d 362, 378 (S.D.N.Y.2010) (internal quotation marks omitted). Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

To state a claim under the statute, then, a plaintiff must plead "[i] that he is a 'qualified individual' with a disability; [ii] that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and [iii] that such exclusion or discrimination was due to his disability." *Varney v. Many,* No. 13 Civ. 5285(VB), 2015 WL 1730071, at *3 (S.D.N.Y. Apr. 14, 2015) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)). Critically, plaintiff must allege his mistreatment "was

motivated by either discriminatory animus or ill will due to disability." *Id.* (internal quotation marks omitted). "Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Id.* (citing *Elbert v. N.Y. State Dep't of Corr. Servs.,* 751 F.Supp.2d 590, 595 (S.D.N.Y.2010) (collecting cases)).

**2. Analysis**
Plaintiff contends that "all the defendants and employees and staff violated the ADA [ ][be]cause I have hearing aids." (Compl.9). Defendants argue that Plaintiff's claims must be dismissed because an ADA claim cannot be brought against individuals; Defendants do not otherwise address the merits of Plaintiff's claim. (Def.Br.4).

**a. Plaintiff's ADA Claims Against Individual Defendants Are Dismissed with Prejudice**
Defendants are correct that "individuals cannot be named as defendants in ADA suits in either their official or representative capacities." *Tavares v. N.Y.C. Health & Hosps. Corp.,* No. 13 Civ. 3148(PKC)(MHD), 2015 WL 158863, at *7 n. 8 (S.D.N.Y. Jan. 13, 2015) (citing *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 441 (S.D.N.Y.2004) (dismissing ADA claims against individuals)); *see also Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (holding that Title II of the Americans with Disabilities Act does not provide "for individual capacity suits against state officials"). Plaintiff's ADA claims are therefore dismissed with prejudice against the individual Defendants.

**b. Plaintiff's ADA Claims Against the State Are Dismissed Without Prejudice**
Construed liberally, Plaintiff's complaint can be read to assert an ADA claim against New York State (or DOCCS, the State's agency). Such a claim is actionable under *Tennessee v. Lane,* 541 U.S. 509 (2004), which upheld the ADA's abrogation of a State's Eleventh Amendment immunity, and found that liability extends to include state and local governments, as well as their agencies and instrumentalities. Even if the State or DOCCS were currently party to this action, however, Plaintiff's claim must nevertheless be dismissed.

**\*5** Plaintiff's claim fails because it is a bare, conclusory allegation that does not provide "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 569. First, Plaintiff does not adequately allege any disability, nor does he allege that Plaintiff was prevented from participating in or benefiting from prison programs and services because of his disability: his mere recitation of "because I have hearing aids" is not enough. He does not allege that he has hearing loss or any other disability. When an ADA claim fails to allege that plaintiff was a "qualified individual with a disability," it must be dismissed. *See, e.g., Veloz v. New York,* 178 F. App'x 39, 41 (2d Cir.2006) (summary order) (affirming dismissal of ADA claim where inmate did not demonstrate he was a "qualified individual with a disability").

Likewise, when an ADA claim does not state that a plaintiff was *excluded* from a prison service or program, it must be dismissed. *See Carrasquillo,* 324 F.Supp.2d at 443 (dismissing ADA claim where inmate alleged only that he had difficulty walking to law library and infirmary, not that he was prevented altogether from accessing them, and admitted access on several occasions); *Devivo v. Butler,* No. 97 Civ. 7919(HB), 1998 WL 788787, at *4 (S.D.N.Y. Nov. 10, 1998) (dismissing ADA claim where blind inmate failed to allege that he was denied services in prison because he was blind). Finally, Plaintiff does not allege any discriminatory animus, or that he was excluded from any public service because of ill will against his disability. *See Varney,* 2015 WL 1730071, at *3. Accordingly, Plaintiff's ADA claims are dismissed in their entirety.

Plaintiff has not sought leave to amend his Complaint. However, the principle that the "court should freely give leave [to amend a pleading] when justice so requires," Fed R. Civ. P. 15(a)(2), is particularly applicable to *pro se* plaintiffs, *see Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). "A *pro se* complaint should not be dismissed without the court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (internal quotation marks omitted). "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (internal quotation marks omitted).

Plaintiff's opposition to Defendants' pre-motion letter provides information, albeit sparse, suggesting that an amendment of his ADA claim may not be futile. Specifically, Plaintiff asserts that he has been classified by an audiologist as "HL 30," and argues that he is entitled to certain accommodations under DOCCS Directive # 2612, which addresses accommodations for inmates with hearing impairments. (Pl.Opp.3). [4] He also contends that he has been "denied access" to certain services, including the "Resource Room and the tele-fax machine," although he does not make clear that the denial of access is *because of* ill will towards his disability, or whether he was entirely excluded from those services. (*Id.*). He also claims that he "can't use the regular telephone" since he has not been provided with hearing aids. (*Id.*). [5] But even if Plaintiff's alleged hearing disability does prevent him from using certain services, this is not enough: not receiving proper treatment for a disability is not enough to sustain an ADA claim. Rather, Plaintiff must allege that he was mistreated *because of* his disability. *See Elbert,* 751 F.Supp.2d at 596 (dismissing ADA claims where "Plaintiff [was] claiming that Decedent was not properly treated *for* his [disability], not that he was mistreated *because of* his [disability]" (emphases in original)); *see also Varney,* 2015 WL 1730071, at *3.

**\*6** The Court therefore will permit Plaintiff to amend his ADA claims, if he believes he can allege facts that support the elements of such a claim as set forth herein. If Plaintiff chooses to amend his ADA claims, he may also amend to add the public entity DOCCS, despite its prior dismissal from this action. If Plaintiff fails to re-plead these claims adequately, they may be dismissed with prejudice.

## C. Plaintiff's Claims of Religious Deprivation Are Dismissed

Plaintiff brings his religious-liberty claims pursuant to two separate statutes: 42 U.S.C. § 1983 and Section 3 of RLUIPA, 42 U.S.C. § 2000cc–1.

### 1. Applicable Law

#### a. Claims Under Section 1983

Plaintiff first relies on Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "The purpose of [Section] 1983 is to deter state actors from using the badge of

their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161 (1992). As such, a "[Section] 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998).

In attempting to ascertain the putative violation of rights underlying Plaintiff's Section 1983 claim, Defendants have construed the Complaint to allege violations of the Free Exercise Clause of the First Amendment, which guarantees the right to the free exercise of religion. Convicted felons do not relinquish this right upon incarceration. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) ("Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." (internal citations omitted)); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." (internal citation omitted)). It is well-accepted, however, that a prisoner's right to exercise his religion involves considerations that do not apply to persons outside of the penal system. Namely, "the prisoner's right is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Woodward v. Perez,* No. 12 Civ. 8671(ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (internal quotation marks omitted); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("A prisoner's right to practice his religion is ... not absolute."). Accordingly, free exercise claims of prisoners are judged "under a reasonableness test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone,* 482 U.S. at 349); *see Vann v. Fischer,* No. 11 Civ.1958(KPF), 2014 WL 4188077, at *8–14 (S.D.N.Y. Aug. 25, 2014) (finding burdens imposed on inmates wearing religious beads were reasonably related to legitimate penological interest of inmate safety), *reconsideration denied,* No. 11 Civ.1958(KPF), 2015 WL 105792 (S.D.N.Y. Jan. 7, 2015).

**\*7** Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d at 274–75. [6] "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (alterations and internal quotation marks omitted).

"A substantial burden on religious exercise exists when an individual is required to choose between following the precepts of his religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of his religion on the other hand." *Vann,* 2014 WL 4188077, at *9 (alterations and internal quotation marks omitted) (citing *Westchester Day Sch. v. Village of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007)). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important" to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at *4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Although Defendants do not address it, this Court also construes Plaintiff to have alleged violations of the First Amendment's Establishment Clause. Indeed, in his opposition to Defendants' pre-motion letter, Plaintiff specifically refers to the Establishment Clause. (Pl.Opp.4). The First Amendment's Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602 (1971). *See Bronx Household of Faith v. Bd. of Educ. of N.Y.C.,* 650 F.3d 30, 40 n. 9 (2d Cir.2011) ("Although the *Lemon* test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."). Under *Lemon,* "government action which interacts with religion [i] must have a secular purpose, [ii] must have a principal or primary effect that neither advances nor inhibits religion, and [iii] must not foster an excessive government entanglement with religion."

*Bronx Household of Faith,* 650 F.3d at 40 (alterations and internal quotation marks omitted) (citing *Lemon,* 403 U.S. at 612–13). "[A]t the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion." *Pugh v. Goord,* 571 F.Supp.2d 477, 494 (S.D.N.Y.2008) (quoting *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 703 (1994)).

**\*8** Given that plaintiff is a prisoner challenging a DOCCS action or regulation, "the *Lemon* test is tempered by the test laid out by the Supreme Court in [*Turner v. Safley,* 482 U.S. 78 (1987) ], which found that a prison regulation that impinges on an inmate's constitutional rights is nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh,* 571 F.Supp.2d at 494 (internal quotation marks omitted). Additionally, "in the prison context, the [E]stablishment [C]lause has been interpreted in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." *Muhammad v. N.Y.C. Dep't of Corr.,* 904 F.Supp. 161, 198 (S.D.N.Y.1995) (internal quotation marks omitted); *see also id.* ("In order to permit inmates to freely exercise their religion, *some* entanglement is necessary." (emphasis in original)). As discussed further below, regardless of the underlying constitutional violation Plaintiff alleges—whether under the Free Exercise Clause, the Establishment Clause, or something else entirely—he must allege the personal involvement of Defendants to state a claim under Section 1983. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006).

### b. Claims Under RLUIPA

"RLUIPA offers similar protections to prisoners as the Free Exercise Clause but heightens the standard for both plaintiffs and defendants." *Woodward,* 2014 WL 4276416, at \*6 (citation and internal quotation marks omitted). "RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise'[ ] of inmates in certain institutions unless the government shows that the burden furthers a compelling interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d at 273 (footnote omitted) (quoting 42 U.S.C. § 2000cc–1(a)). "Only if a plaintiff shows that his religious exercise has been substantially burdened, do the defendants need to show something more than a rational relationship between the policy at issue and a governmental interest." *Woodward,* 2014 WL 4276416, at \*6. If the plaintiff demonstrates that the "state has imposed a substantial burden on the exercise of his religion[,] ... the state may overcome a RLUIPA claim

by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing 42 U.S.C. § 2000cc–1(a)).

### 2. Analysis

#### a. Official Capacity Damages Claims Brought Under Section 1983 Are Dismissed

The Eleventh Amendment, as a general matter, makes states immune from suit. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54 (1996). Eleventh Amendment immunity applies also to state officials sued in their official capacities. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101–02 (1984). "Employees of DOC[C]S and its facilities, when sued in their official capacities, have been held to be subject to the State's Eleventh Amendment immunity." *Lyerly v. Phillips,* No. 04 Civ. 3904(PKC), 2005 WL 1802972, at \*3 (S.D.N.Y. July 29, 2005) (collecting cases). "The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his individual or personal capacity." *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (internal quotation marks omitted). Thus, to the extent Plaintiff sues Defendants in their official capacities under Section 1983, his claims are dismissed. He may still, however, seek money damages against Defendants in their personal capacities.

#### b. Official and Individual Capacity Damages Claims Brought Under RLUIPA Are Dismissed

**\*9** RLUIPA does not afford a plaintiff a cause of action for money damages against individual defendants in either their official capacities, *Sossamon v. Texas,* 131 S.Ct. 1651, 1663 (2011), or their individual capacities, *Washington v. Gonyea,* 731 F.3d 143, 145 (2d Cir.2013). Accordingly, to the extent Plaintiff seeks monetary damages under RLUIPA, those claims are dismissed.

Plaintiffs may, however, seek injunctive relief against officials in their official capacities. *See Sossamon,* 131 S.Ct. at 1658 (holding that "a waiver of sovereign immunity to other types of relief does not waive immunity to damages"); *id.* at 1666 (Sotomayor, J., dissenting) (observing that "the majority appears to accept that equitable relief is available to RLUIPA plaintiffs"); *see*

*also Goode v. Bruno,* No. 10 Civ. 1734(SRU), 2013 WL 5448442, at *7 (D.Conn. Sept. 30, 2013) (permitting a RLUIPA claim for injunctive relief to continue past summary judgment). [7] All that remains for this Court's consideration, then, are his claims for injunctive relief under RLUIPA and his claims for personal capacity monetary damages under Section 1983.

### c. Plaintiff Has Failed to Plausibly Allege the Personal Involvement of Defendants

Plaintiff brings claims against 12 individual Defendants, including the Governor of the State of New York, the Commissioner of the New York State Police, the former Commissioner of DOCCS, six facility superintendents, and a DOCCS Director. As a prerequisite to relief under both Section 1983 and RLUIPA, a plaintiff must show the personal involvement of defendants in the alleged constitutional deprivations. *See Farrell,* 449 F.3d at 484 (Section 1983); *Covington v. Mountries,* No. 13 Civ. 343(VEC), 2014 WL 2095159, at *5 (S.D.N.Y. May 20, 2014) (RLUIPA). To show personal involvement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555).

A court may consider supervisory personnel "personally involved" if a plaintiff plausibly alleges facts showing that those defendants: (i) participated directly in the alleged constitutional violation; (ii) failed to remedy the wrong after being informed of it; (iii) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts. *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). [8]

*10 "The bare fact that [an official] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874; *see also Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (explaining

that sustaining a Section 1983 claim "requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior does not apply"). "Even where there has been a constitutional violation, receipt of letters or grievances is insufficient to impute personal involvement." *Dilworth v. Goldberg,* No. 10 Civ. 2224(RJH)(GWG), 2011 WL 3501869, at *19 (S.D.N.Y. July 28, 2011) (citation, alteration, and quotation marks omitted), *report and recommendation adopted,* 2011 WL 4526555 (S.D.N.Y. Sept 30, 2011). Further, "[t]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Vann,* 2014 WL 4188077, at *7 (citation omitted). "Nor is a supervisor liable under [Section] 1983 when she receives a letter and forwards it to the appropriate staff personnel to handle, but takes no other action." *Id.; see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.2007) (affirming dismissal for failure to allege personal involvement where defendant referred one letter and responded to the next by informing plaintiff that a decision had been rendered). Additionally, after *Iqbal,* under both Section 1983 and RLUIPA, "an official's denial of a grievance alleging a constitutional deprivation, without more, does not amount to personal involvement in the deprivation of that right." *Joseph v. Fischer,* No. 08 Civ. 2824(PKC)(AJP), 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009). "Only where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint) can the supervisor be held personally involved for [Section] 1983 purposes." *Vann,* 2014 WL 4188077, at *7 (internal quotation marks omitted). As Defendants argue, Plaintiff has not met the burden of pleading personal involvement for any of the 12 individual Defendants.

### i. Dr. Adams, C.O. Hayes, and Sgt. Hutti

With regards to Dr. Adams, C.O. Hayes, and Sgt. Hutti, Plaintiff simply does not allege any involvement in, or even awareness of, his purported religious deprivations. Accordingly, to the extent that Plaintiff's complaint makes religious deprivation claims against Dr. Adams, C.O. Hayes, and Sgt. Hutti, those claims are dismissed.

### ii. Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico

Plaintiff alleges that Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico violated RLUIPA and the Free Exercise Clause by failing

2015 WL 3604242

to hire a Hindu chaplain and failing to provide him with a special Hindu diet. (Compl.5–6). As Defendants point out (Def.Br.6–7), Plaintiff does nothing more in his Complaint than name these individuals, reference their job titles, make conclusory allegations that they failed to provide him a Hindu chaplain and diet, and attach letters he sent them complaining about the lack of a Hindu chaplain. (*See* Compl. 5–6, 22; Dkt. # 2–2 at 22–24). Receipt by these officials of letters of complaint, even if true, is simply not enough to establish personal involvement. *See Dilworth,* 2011 WL 3501869, at \*19. [9] Plaintiff's claims against these Defendants are apparently predicated entirely upon their positions of authority within New York State. Accordingly, Plaintiff's religious deprivation claims against Governor Cuomo, Former Commissioner Fischer, and Superintendent D'Amico are dismissed.

### iii. Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris

**\*11** Plaintiff also alleges that Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris violated RLUIPA and the Free Exercise Clause by failing to hire a Hindu chaplain and failing to provide him with a special Hindu diet. (Compl.5–6). As with the other Defendants, Plaintiff does not include any specific factual allegations against these Defendants; he simply provides their names and titles and alleges they failed to hire a Hindu chaplain or provide him with a special diet. Claiming that these individuals are in the chain-of-command in the prison hierarchy is not enough to allege personal involvement. *See Colon,* 58 F.3d at 874. Plaintiff further attaches letters and grievance determinations to the Complaint; these attachments purport to demonstrate that these Defendants were copied on correspondence complaining about the lack of Hindu chaplain or that they reviewed Plaintiff's grievances. Significantly, however, alleging that these Defendants received and reviewed letters and grievances, or even that they denied the relief sought in grievances, is not enough to plead their personal involvement. Accordingly, Plaintiff's religious deprivation claims against Superintendents Perez, Rock, Racette, Graham, LaValley, and Director Morris are dismissed.

### d. Plaintiff Has Failed to State a Claim for Religious Deprivation

Plaintiff's Complaint is dismissed solely on the ground that he has failed to allege any personal involvement by

Defendants. However, because Plaintiff is *pro se,* because his claims are dismissed without prejudice (except where specified), and because Plaintiff's claims as-pleaded are wholly inadequate, the Court will address the substance of Plaintiff's religious deprivation claims as well. Plaintiff does not adequately allege any facts that demonstrate that his ability to practice his religion has been unlawfully burdened by the failure of DOCCS to hire a Hindu chaplain or provide him a special religious diet.

### i. Plaintiff's Claims Regarding the Failure to Hire a Hindu Chaplain Are Deficient

Plaintiff's claims regarding religious discrimination are vague and conclusory. Plaintiff simply repeats in his Complaint that his "freedom of religion" has been "violated," that he has been subject to "religious discrimination," that there have been "important Holy Days and Rituals that [he] could not properly observe" due to religious discrimination, that Defendants have "disregard[ed][his] religious needs [and] religious rites," and that they have failed "to accommodate [him] religiously." (Compl.5–6). Plaintiff's opposition to Defendants' pre-motion letter is no better, incanting repeatedly the legal conclusion that his practice of religion has been substantially burdened. (Pl.Opp.1–2, 4).

The operative Complaint does not allege any facts that "nudge [Plaintiff's] claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.,* 502 F.3d at 50. Plaintiff makes no showing regarding how contact with Hindu advisors is "central or important" to the practice of his faith, necessary to sustain a Free Exercise claim. *Rossi v. Fischer,* No. 13 Civ. 3167(PKC)(DF), 2015 WL 769551, at \*10 (S.D.N.Y. Feb. 24, 2015) (dismissing free exercise claim based on lack of access to advisors). Nor does he explain how not having a Hindu advisor impermissibly burdens his practice of his religion. He claims his religious "needs" and "rites" have been disregarded, and that he has not been able to "properly" observe religious holidays. (Compl.6). But Plaintiff does not identify any specific needs, rites, or holidays; nor does he allege the facts of any occasion when any Defendant has actually interfered with the practice of his religion. Plaintiff simply complains that it is "religious discrimination" that DOCCS "provide[s] chaplains for Muslims, Jews, Catholics, Christians, Protestant[s], [and] Nation of Islam," but not for his religion, "which is an equally large religion." (Compl.6). These conclusory

allegations are not enough to state a claim under the First Amendment or RLUIPA. [10]

### ii. Plaintiff's Claims Regarding the Failure to Provide a Special Religious Diet Are Deficient

**\*12** Plaintiff also fails to state a claim as it concerns his diet. It is true that it has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975); *see also McEachin,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."). But Plaintiff again only makes conclusory allegations: he claims that the food that DOCCS provides is "not in accordance with my religious beliefs and religious diet," and that they have failed to accommodate his "dietary needs in accordance with [his] religion." (Compl.5–6). Plaintiff's opposition to Defendants' pre-motion letter does not fill in any detail; it simply claims, "For all food served in messhall, as well as[ ] sold in commissary, doesn't comply nor fall within the criteria for practicing Hinduism. Therefore, Plaintiff is forced to eat food that goes against his religious diet and belief." (Pl.Opp.2). Plaintiff does not allege what a Hindu diet is, or identify how the meals he is provided are not compatible with that diet.

Moreover, during the July 29, 2014 conference, Plaintiff suggested that his discontent with his prison diet stemmed not from the dictates of his religion, but from the fact that in accommodating his religious diet the facility often substituted animal proteins with soy protein, which is something Plaintiff does not personally eat. (July 29, 2014 Tr. 11–12). The Court cautions Plaintiff that DOCCS is under no obligation to accommodate his personal dietary preferences; it only must accommodate diets dictated by his practice of his religion. *See Kahane,* 527 F.2d at 496 (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left to the prison's management which can provide from the food supplies available within budgetary limitations"); *see also Rossi,* 2015 WL 769551, at \*9 (finding plaintiff did not plausibly allege Free Exercise Clause claim where he

did not allege that holy day meals were inconsistent with religious beliefs or explain how adding certain items to the meals was "central or important" to his religion).

### D. Plaintiff's Retaliation Claims Are Dismissed

Finally, Plaintiff alleges that Defendants retaliated against him for filing grievances by denying him needed medical care and otherwise subjecting him to "harassment, threats, [and] retaliation ." (Compl.9). To establish a First Amendment claim of retaliation, a plaintiff must show: "[i] that the speech or conduct at issue was protected, [ii] that the defendant took adverse action against the plaintiff, and [iii] that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (citation omitted). In the prison context, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Wrobel v. County of Erie,* 692 F.3d 22, 31 (2d Cir.2012) (citation omitted). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citation omitted); *see also Wrobel,* 692 F.3d at 31.

**\*13** When considering a prisoner's retaliation claims, the court must bear in mind that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation omitted). Since it is "near[ly] inevitabl [e]" that "prisoners will take exception" with the decisions of prison officials, and given "the ease with which claims of retaliation may be fabricated," the Second Circuit has cautioned that prisoners' retaliation claims must be "examin[ed] ... with skepticism and particular care." *Colon,* 58 F.3d at 872; *see also Davis,* 320 F.3d at 352. "To survive a motion to dismiss, such claims must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000) (citation omitted).

Although Plaintiff has satisfied the first prong of a retaliation claim—the First Amendment protects prisoners from retaliation for the filing of grievances and lawsuits, *Davis,* 320 F.3d at 352–53—his claims are stated in "wholly conclusory terms," *Friedl,* 210 F.3d at 86, and must be dismissed. With regards to "all defendants," Plaintiff alleges they violated his rights "in many ways as to harassment, threats, retaliation, false misbehavior

reports, messing with legal mail and reg[ular] mail, moving around from one floor to other then moving me from facility to facility creating undue hardship as well as to my family and love[d] ones too with all the games by these defendants." (Compl.9). As Defendants argue (Def.Br.13), this claim must be dismissed because even under the most liberal reading of the Complaint, Plaintiff's allegations are wholly conclusory and lacking in facts sufficient to connect each Defendant to a retaliatory action. *See Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) (dismissing complaint where plaintiff named defendants in caption but body of complaint contained no allegations explaining how defendants violated the law or injured plaintiff), *aff'd sub nom. Dove v. O'Hare,* 210 F.3d 354 (2d Cir.2000); *see also Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *6 (S.D.N.Y. Jan. 18, 2011) (dismissing as too conclusory allegations that defendants made false reports and made death threats "solely on the basis of retaliatory reprisal").

In alleging his retaliation claims, Plaintiff does specifically name Defendants Dr. Adams, C.O. Hayes, Sgt. Hutti, and Superintendent LaValley. (Compl.8). Even so, Plaintiff's allegations against these Defendants are far too conclusory to state a claim. He alleges they retaliated by issuing him two "false tickets" and engaging in the "biggest set up" to have him transferred from the Clinton Correctional Facility. (*Id.*). Plaintiff does not specify who issued these "false tickets" or which grievances these allegedly retaliatory actions were in response to; he does not state what acts each of these Defendants took in retaliation; and he does not establish any time frame that

might permit an inference of a causal connection. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (finding that failure to set forth a time frame for the alleged events precludes inference of a causal relationship for purposes of retaliation claim), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002). Plaintiff has not pleaded enough facts to state a claim for retaliation. His retaliation claims are therefore dismissed without prejudice.

## CONCLUSION

**\*14** For the foregoing reasons, the Complaint is dismissed in its entirety. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

Should Plaintiff wish to attempt to re-plead those claims that were dismissed without prejudice, he may submit an amended complaint in accordance with this Opinion on or before **August 10, 2015,** and this case will be reopened. Plaintiff is cautioned that if submits an amended complaint that does not address—and rectify—the deficiencies discussed in this Opinion, some or all of his claims may be dismissed with prejudice.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 3604242

---

Footnotes

1    The facts alleged herein are drawn from Plaintiff's Complaint ("Compl." (Dkt.# 2)), and are assumed true for the purposes of this Opinion. Citations to the Complaint are made using the page-numbering convention imposed by this Court's electronic case filing ("ECF") system. Plaintiff attached a large volume of documents to his Complaint, and it was therefore docketed as 12 separate PDFs. To the extent this Opinion cites documents contained within the first PDF (Dkt.# 2), those will be referenced as "Compl. [page number]." To the extent this Opinion cites documents contained in the other 11 PDFs, docket entries 2–1 to 2–11, those will be referenced as "Dkt. # 2–1 at [page number]," and so on. Defendants' memorandum of law in support of their motion to dismiss (Dkt.# 71) will be referred to as "Def. Br." As discussed further below, Plaintiff's opposition to Defendants' pre-motion letter (Dkt.# 46) will be referred to as "Pl. Opp."; Plaintiff did not submit any formal opposition to Defendants' motion.

2    Plaintiff has moved between facilities several times. Discerning the exact timeline of Plaintiff's facility moves is not necessary to the resolution of the instant motion.

3    Given that Plaintiff styled his Complaint as based entirely on Section 1983, and only referenced the ADA in a single line, the Court did not at that time construe Plaintiff to have brought valid claims under any statutes under which Congress had abrogated the states' immunity. *See Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 40 (2d Cir.1977) (finding that Congress has not abrogated the states' Eleventh Amendment immunity under Section 1983); *cf. United*

*States v. Georgia,* 546 U.S. 151, 159 (2006) (establishing three-part process for determining whether Congress had validly abrogated a state's immunity from suit for certain ADA claims).

4    The Court takes notice that the classification of "HL 30" means the inmate has "non-significant hearing loss" under the Directive, but may nonetheless be entitled to some accommodations. *See, e.g., Rosales v. LaValley,* No. 11 Civ. 106(MAD)(CFH), 2012 WL 7688115, at *1 (N.D.N.Y. Nov. 2, 2012) (discussing and quoting text of Directive # 2612), *report and recommendation adopted in part, rejected in part,* 2013 WL 992547 (N.D.N.Y. Mar. 13, 2013).

5    In this regard, the Court cautions Plaintiff that false or frivolous claims will be dismissed. In particular, Plaintiff's allegations that he cannot use a telephone strain credulity where he has participated in a telephone conference with the Court unaided, and heard and responded to everything the Court said. (*See generally* July 29, 2015 Tr.).

6    "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (quoting *Salahuddin v. Goord,* 467 F.3d at 27475). However, because here the Court finds that Plaintiff has not pleaded sufficient facts to allege the personal involvement of any Defendants or to establish any burden on his religious beliefs, the Court need not grapple with the weight of the burden at this time.

7    Although Defendants do not make this argument, it is also possible that Plaintiff's RLUIPA claims for injunctive relief should be dismissed as moot. In this Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d at 272; *see also Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."). Plaintiff is currently incarcerated at Attica Correctional Facility, and all Defendants are employed elsewhere, potentially rendering his claims moot. Certain decisions in this District have allowed claims for injunctive relief against prison officials to proceed despite an inmate's transfer from the facility in question, under the theory that such claims may be "capable of repetition, yet evading review." *Pugh,* 571 F.Supp.2d at 489. However, the Court's determination that Plaintiff has not adequately pleaded a claim means that it will not consider the mootness issue at this time.

8    Courts have disagreed as to whether the five *Colon* factors continue to apply after *Iqbal. See generally McNaughton v. de Blasio,* No. 14 Civ. 221(KPF), 2015 WL 468890, at *5 n. 8 (S.D.N.Y. Feb. 4, 2015) (collecting cases). Any such uncertainty, however, does not alter settled law that "[t]he mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under [Section] 1983." *Styles v. Goord,* 431 F. App'x 31, 33 (2d Cir.2011) (summary order) (collecting cases).

9    At least one letter attached to the Complaint indicates that former Commissioner Fischer referred Plaintiff's letter to the appropriate official for handling. (*See, e.g.,* Dkt. # 2–2 at 18). Referring an inmate's complaint to the appropriate staff is not enough to establish personal involvement. *See Vann,* 2014 WL 4188077, at *7.

10   Determining whether a challenged policy is reasonably related to a legitimate penological interest is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. *See Ford,* 352 F.3d at 596 (declining to determine whether defendants' conduct was reasonably related to legitimate penological interests on motion to dismiss because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court declines to assess whether there is a "valid, rational connection" between Defendants' actions and their purported concerns. *See Turner,* 482 U.S. at 89.

   The Court notes, however, that Defendants advance strong arguments based on the record in this case, which is more voluminous than is typical on a motion to dismiss due to the number of documents Plaintiff attached to his Complaint. (Def.Br.11). Specifically, as Defendants argue, letters Plaintiff attached to his complaint strongly support that because so few inmates are Hindu—comprising less than one percent of the DOCCS prison population—it was not fiscally justifiable to employ a Hindu chaplain on staff. (*See* Dkt. # 2–2 at 18, # 2–11 at 13). The Court may revisit Defendants' arguments if further motion practice ensues.

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.